FILED'10 MAR 22 11:44USDC-ORP

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| KATHLEEN LOUISE HOLLAND, | ) | Civil No. 08-1194-JE |
| | ) | |
| Plaintiff, | ) | OPINION AND ORDER |
| | ) | |
| v. | ) | |
| | ) | |
| COMMISSIONER of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Tim Wilborn
Attorney at Law
P.O. Box 2768
Oregon City, OR 97045

      Attorney for Plaintiff

Dwight C. Holton
Acting U.S. Attorney
Adrian L. Brown
Asst. U.S. Attorney
1000 S.W. 3rd Avenue, Suite 600
Portland, OR 97204-2902

OPINION AND ORDER - 1

Thomas M. Elsberry
Special Asst. U.S. Attorney
Social Security Administration
701 5th Avenue, Suite 2900 M/S 901
Seattle, WA 98104-7075

     Attorneys for Defendant

JELDERKS, Magistrate Judge:

Plaintiff Kathleen Holland brings this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of a decision by the Commissioner of Social Security (the Commissioner) denying her application for disability benefits.  For the reasons set out below, the Commissioner's decision is reversed and this action is remanded to the Social Security Administration (SSA) for an award of benefits.

### Procedural Background

Plaintiff filed an application for Social Security Disability Insurance Benefits on June 9, 2005, alleging that she had been disabled since August 18, 2004, because of depression, post traumatic stress disorder, social phobia, and a personality disorder.  After her application was denied initially on July 27, 2005, and upon reconsideration on January 10, 2006, plaintiff timely requested a hearing before an Administrative Law Judge (ALJ).

On November 8, 2007, a hearing was held before ALJ John Madden, Jr.  Plaintiff, who was represented by counsel, and Jeffrey Tittelfitz, a Vocational Expert (VE), testified at the hearing.

On January 4, 2008, the ALJ issued a decision finding that plaintiff was not disabled within the meaning of the Social Security Act (the Act).  Plaintiff seeks review of that decision in the present action.

OPINION AND ORDER - 2

**Factual Background**

Plaintiff was born on September 24, 1962, and was 45 years old at the time of the hearing before the ALJ.  She earned a GED in 1981, and last worked from 1997 through December, 2004, as a distribution clerk.  Plaintiff left work on a medical leave of absence, and was administratively terminated after she did not return.

**Disability Analysis**

The ALJ engages in a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act.  20 C.F.R. §§ 404.1520, 416.920.  Below is a summary of the five steps, which also are described in Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999).

Step One.  The Commissioner determines whether the claimant is engaged in substantial gainful activity (SGA).  A claimant engaged in such activity is not disabled.  If the claimant is not engaged in substantial gainful activity, the Commissioner proceeds to evaluate the claimant's case under Step Two.  20 C.F.R. § 404.1520(b).

Step Two.  The Commissioner determines whether the claimant has one or more severe impairments.  A claimant who does not have such an impairment is not disabled.  If the claimant has a severe impairment, the Commissioner proceeds to evaluate claimant's case under Step Three.  20 C.F.R. § 404.1520(c).

Step Three.  Disability cannot be based solely on a severe impairment; therefore, the Commissioner next determines whether the claimant's impairment "meets or equals" one of the impairments listed in the SSA regulations, 20 C.F.R. Part 404, Subpart P, Appendix 1.  A

claimant who has such an impairment is disabled.  If the claimant's impairment does not meet or equal one listed in the regulations, the Commissioner's evaluation of the claimant's case proceeds under Step Four.  20 C.F.R. § 404.1520(d).

Step Four.  The Commissioner determines whether the  claimant is able to perform work he or she has done in the past.  A claimant who can perform past relevant work is not disabled.  If the claimant demonstrates he or she cannot do work performed in the past, the Commissioner's evaluation of the claimant's case proceeds under Step Five.  20 C.F.R. § 404.1520(e).

Step Five.  The Commissioner determines whether the claimant is able to do any other work.  A claimant who cannot perform other work is disabled.  If the Commissioner finds that the claimant is able to do other work, the Commissioner must show that a significant number of jobs exist in the national economy that the claimant can do.  The Commissioner may satisfy this burden through the testimony of a vocational expert (VE) or by reference to the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2.  If the Commissioner demonstrates that a significant number of jobs exist in the national economy that the claimant can do, the claimant is not disabled.  If the Commissioner does not meet this burden, the claimant is disabled.  20 C.F.R. § 404.1520(f)(1).

At Steps One through Four, the burden of proof is on the claimant.  Tackett, 180 F.3d at 1098.  At Step Five, the burden shifts to the Commissioner to show that the claimant can perform jobs that exist in significant numbers in the national economy.  Id.

## Medical Record

In July, 1996, plaintiff began receiving treatment for psychiatric conditions, including major depression, from the Douglas County Mental Health Division. The initial diagnosis she received included Major Depressive Disorder (Moderate) and polysubstance dependence in full remission. Suicidal ideation was noted, and plaintiff's Global Assessment of Functioning (GAF) was rated at 50, a level that indicates "serious impairment." See Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition Text Revision (2000)(DSM-IV-TR) at 34. Plaintiff's intellectual functioning was rated as "good." Plaintiff reported "unwarranted and uncontrollable sadness," aversion to social contact, anxiety, difficulty concentrating, and occasional "very tense feelings with anxiety." She also reported difficulty sleeping and poor appetite. Plaintiff attended counseling sessions through November, 1998, and stopped receiving treatment when her insurance changed and she could not afford services.

Records from Ingram Distribution Group, Inc., where plaintiff worked from 1997 through 2004, indicate that, beginning in 1998, plaintiff took a number of extended medical leaves of absence because of mental health problems. In a "certification of Health Care Provider" dated January 20, 2005, submitted in support of plaintiff's request for leave pursuant to the Family Medical Leave Act, Allyson Mieth-Myers, plaintiff's treating mental health nurse, indicated that plaintiff was "currently incapacitated with depressive anxiety symptoms," and might "end up being off 6-8 weeks . . . ." Ms. Mieth-Myers stated that plaintiff was "unable to work at any job when symptoms are at their worst."

Plaintiff was treated by Ms. Mieth-Myers from 2002 through 2005. Mieth-Myers' treatment notes indicate that plaintiff's symptoms fluctuated significantly. The notes indicate

that plaintiff experienced panic attacks, anxiety, depression, dizziness, and chronic pain, including headaches, and that plaintiff missed work frequently. Plaintiff also reported many problems with insomnia. In a note dated March 17, 2005, while plaintiff was on medical leave, Mieth-Myers stated that plaintiff was having difficulty remembering words, was transposing letters and numbers, and was worried about going back to work and making mistakes.

As part of plaintiff's requests for continued medical leave from her last employment, Mieth-Myers completed psychiatric questionnaires dated January 12, 2005, March 24, 2005, and June 8, 2005. On the questionnaire dated January 12, 2005, Mieth-Myers listed plaintiff's diagnoses as including major depression, recurrent, severe, with psychotic features; generalized anxiety disorder; PTSD; and migraine headaches. She also noted that plaintiff suffered from migraine headaches. Mieth-Myers listed plaintiff's occupational problems as poor concentration, energy, motivation; conflict with co-workers; and safety issues. She indicated that plaintiff experienced suicidal ideation and had "multiple somatic complaints." Mieth-Myers noted that plaintiff had trouble solving problems, and increased irritability and emotional lability. She opined that plaintiff would have moderate impairment in activities of daily living and marked impairment in social functioning, concentration, persistence, and pace, and adaptation to stressful conditions. Mieth-Myers also opined that noise and production requirements increased plaintiff's anxiety, especially when her depression symptoms were worse. She rated plaintiff's GAF at 50.

In the questionnaire dated March 24, 2005, Mieth-Myers added a diagnosis of avoidant personality disorder, assessed plaintiff's GAF as 51, and stated that plaintiff was

"extremely forgetful, transposing numbers, unable to complete ADLs." She added that anxiety would increase plaintiff's paranoia.

In the questionnaire dated June 5, 2005, Mieth-Myers stated that plaintiff's estimated time of recovery was "unknown due to poor response to medication/therapy."

Allan Kirkendall, Ph.D., a psychologist, evaluated plaintiff on July 14, 2005. Dr. Kirkendall noted that plaintiff had lost her most recent job "due to her excessive use of medical leave." He noted that plaintiff reported that she had missed more work each year there because of her depression and "inability to be around people." Plaintiff reported that she had become very ill towards the end of her work for Ingram Book Company, "suffering from headaches and generally feeling very poorly." She said she was not currently looking for work because she had "concluded that she simply cannot tolerate being around people." Plaintiff recounted the medications she was taking, and opined that her condition had slowly worsened, despite the counseling she had received and the various psychiatric medications she had taken. She reported that she had been diagnosed with PTSD because of abuse inflicted on her by her first husband. Plaintiff told Dr. Kirkendall that she did not like to leave her home, and felt as if "she's being watched all the time."

Dr. Kirkendall opined that plaintiff did not appear to exaggerate her difficulties, or to be a malingerer. He noted that she presented with an anxious affect, and stated that she appeared to suffer from serious mental illness, which had "resulted in her becoming very socially isolated." Plaintiff maintained "very poor eye contact," and complained of a long term problem with anxiety and panic attacks.

Dr. Kirkendall diagnosed plaintiff with panic disorder with agoraphobia and polysubstance abuse in long remission. He rated her GAF at 55, and summarized his evaluation as follows:

> Ms. Kathleen L. Holland presented as an individual who is suffering from a marked anxiety disorder. It appears from a strictly intellectual point of view that she could understand and remember instructions, however her anxiety is probably such that in a social setting she would have a difficult time understanding and remembering instructions. She does appear to be a person . . . who can sustain concentration and attention if not anxious. She is a persistent individual. She is capable of engaging in appropriate social interactions. She has very little in the way of adaptive skills. At this point, she's becoming increasingly socially isolated due to her mental health problems and despite extensive treatment these problems appear to be getting worse, not better.

Dr. Kirkendall opined that plaintiff could not work at that time.

In the write up of a one-hour psychiatric medication evaluation conducted on September 13, 2005, Mieth-Myers indicated that she had told plaintiff that "using social security disability for an interim time is very appropriate and that it does not mean that she can never go back to work." She concluded that plaintiff had "made some improvement especially with her somatic complaints," and that plaintiff had "noticed a positive change with the Lamictal and is tolerating it well at this time." Ms. Mieth-Myers noted that she had encouraged plaintiff to "work on filling out the social security papers."

In a treatment synopsis dated September 26, 2006, Mieth-Myers noted that she had been treating plaintiff since December, 1998, for problems that included depression and severe anxiety. She noted that plaintiff's symptoms had varied throughout that period, and that plaintiff had experienced "great difficulty with her relationships and with her job situation" during periods when her symptoms were exacerbated. Mieth-Myers stated that plaintiff was on short-term disability, and had been in treatment every other week for approximately six months after going on leave in January, 2005. She noted that plaintiff had

tried a number of medications, but had "never had a robust response to the antidepressants that have been tried," and that, though her response to medications was typically good at first, the effectiveness wore off over time. Mieth-Myers added that plaintiff often experienced intolerable side-effects from medications. She opined that plaintiff's work limitations included

> not working within a situation where there is close proximity to coworkers, she does not perform well when being scrutinized and having to work with production in mind. When asked to complete complex tasks and follow detailed instructions, this causes Kathleen a great deal of distress and exacerbates her depressive and anxiety symptoms. She could most likely work in a simple routine low stress job that does not require her to work in close proximity to coworkers. Due to her symptoms, it is doubtful that she would be able to maintain a 40 hour per week work schedule without having accommodations for her illnesses.

> ***

> When her symptoms are exacerbated, she does become extremely avoidant of social and work situations and becomes completely housebound. There is a level of agoraphobia when the symptoms are exacerbated and when she is in a level of absence from the symptoms the agoraphobic behaviors do decline somewhat but there is still a level present. Kathleen does exhibit paranoid thinking processes when her symptoms exacerbate and these include feeling that people are plotting against her and purposely avoiding her. She has a very difficult time with the paranoia when she is trying to work and it causes her such distress that she will leave the place of work.

Mieth-Myers listed plaintiff's diagnoses as major depression severe, with psychotic features; social anxiety disorder, chronic pain syndrome, and polysubstance abuse, in full remission.

Plaintiff was evaluated by Ryan Scott, Ph.D., a psychologist, on October 26, 2007. Dr. Scott's testing showed that plaintiff's full scale IQ score was 103, and produced a personality inventory that Dr. Scott found to be valid. Results showed significant anxiety,

depression, somatic stress, social detachment, and negative relationships.  Dr. Scott noted
that plaintiff

> appears to have pronounced psychological issues which have had a significant
> effect on her life.  She appears to have significant entrenched mental health
> issues particularly around anxiety, depression, and personality issues.  In
> regards to what are termed Axis I diagnoses, she appears to have significant
> symptoms consistent with panic disorder with agoraphobia.  It appears that
> this anxiety disorder dominates her life, making it very difficult for her to
> interact with the general public or leave her home.  She appears to do best
> when she has no contact with anyone, except perhaps her significant other,
> however, in the past these relationships have been very disruptive as well.

Dr. Scott noted that, though plaintiff took medication for anxiety and limited her

contact with others, she reported having numerous panic attacks.  He also noted that she

experienced significant physical symptoms related to stress, including irritable bowel

syndrome and stomach and shoulder pain.  He opined that plaintiff had the following

limitations:

> In regards to activities of daily living, Ms. Holland appears very impaired by mental
> health issues.  Cognitive testing suggests she does have the cognitive abilities to
> perform work tasks if not impaired by mental health issues.  In fact cognitive testing
> found she had significant strengths in that area.  However, she appears very limited in
> her work choices because very few jobs offer the opportunity to have cognitive
> challenge while not being involved with the general public whatsoever.  Mental health
> impairment interferes with her ability to perform work tasks, in that she has very little
> ability to work cooperatively with others.  Her mental health conditions would likely
> be a distraction to other coworkers.  She would also likely have difficulty following
> complex instructions or carrying out complex instructions because her anxiety likely
> interferes with her ability to do these tasks.  This is corroborated by personality
> testing.

Dr. Scott diagnosed plaintiff with panic disorder with agoraphobia; major depressive

disorder, recurrent, severe; avoidant personality disorder; and dependent personality features.

He assessed plaintiff's GAF as 38, a level indicating major impairment in several areas, such

as work, family relationships, judgment, thinking, or mood.  Diagnostic and Statistical

Manual of Mental Disorders, Fourth Edition, Text Revision (2000)(DSM-IV), page 34.

OPINION AND ORDER - 10

In the functional capacity questionnaire that he completed, Dr. Scott opined that plaintiff would be moderately limited in her ability to understand, remember, and carry out very short and simple instructions, sustain an ordinary routine without special supervision, make simple work-related decisions, maintain socially appropriate behavior, and set realistic goals or make plans independently of others.[1]  He opined that plaintiff would have marked limitations in her ability to understand, remember, and carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, work in coordination with or proximity to others without being distracted by them, complete a normal work day and work week without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public, ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers or peers without distracting them or exhibiting behavioral extremes, respond appropriately to changes in the work setting, and travel in unfamiliar places or use public transportation.

In a letter to plaintiff's counsel dated October 25, 2007, Ms. Mieth-Myers stated that, while plaintiff's GAF when plaintiff was off work was rated at 60, if she was working 40 hours per week, her GAF "would most likely be as low as 50."  Because plaintiff had responded to medications indicated for bipolar II disorder, and had not responded well to

---

[1]On the form, a moderate limitation was defined as an impairment that "seriously limits the ability to function in the area in question, and a limitation that would "preclude <u>sustained</u> performance of jobs in which the function is a critical requirement of the job. . . ."   [Emphasis in original.]

OPINION AND ORDER - 11

anti-depressant medications, Mieth-Myers opined that plaintiff had a bipolar disorder "versus major depression . . . ." She added that bipolar II disorder "is often misdiagnosed because the client does not necessarily have manic episodes but they tend to exhibit more of the paranoia, irritability, and anxiety."

In a letter to plaintiff's counsel dated March 3, 2008, Ms. Mieth-Myers stated that plaintiff's condition had not changed since October, 2007. She noted that plaintiff's dosage of Seroquel, an antipsychotic medication that was also "indicated for Bipolar disorder," had been increased. Mieth-Myers opined that, in order to establish her entitlement to disability benefits, plaintiff might "need to go back to work and then decompensate" before reapplying.

## **Hearing Testimony**

1. Plaintiff's Testimony

Plaintiff testified as follows at the hearing before the ALJ.

Plaintiff had been administratively terminated from her last job after taking a medical leave of absence. She does not have any physical injuries, but experiences physical symptoms as a manifestation of "the mental health issues." Because she lacks insurance, she can no longer afford monthly counseling. Plaintiff takes Lamictal and Seroquel for her mental health conditions.

When plaintiff was working, she experienced severe abdominal distress, chronic neck pain, headaches, and migraine headaches. At the time of the hearing, she experienced cluster headaches behind her left eye only, on a daily basis. When these occurred, plaintiff could not get out of bed or stand up because of nausea. During a one-week vacation, plaintiff experienced severe abdominal distress. At the time of the hearing, plaintiff was having

several panic attacks per week. She also suffered from recurrent insomnia, and could not return to sleep after awakening with a panic attack. Plaintiff did not like to go into stores because she felt as if people were watching her.

Though she was interested in computers, plaintiff lacked the attention span needed to work in the computer field. She had difficulty retaining what she read, and was "not highly functioning." On "bad days," she could not accomplish anything.


2. VE's Testimony

The ALJ posed several hypotheticals for the VE's consideration. In the first, he described an individual of plaintiff's age, education, and work experience who was capable of understanding, remembering, and carrying out simple, routine tasks, should avoid public contact, and could work in the vicinity of others, but would not tolerate one-on-one contact with co-workers well. The VE testified that such an individual could perform plaintiff's past work as a "distributing clerk," but could not perform her past work as a CNA.

The ALJ then asked the VE to consider an individual who "could most likely work in a simple, routine, low-stress job that does not require her to work in close proximity with [the] public and co-workers." The VE testified that such an individual could perform the distributing clerk job.

The ALJ next asked the VE to consider the limitations assessed by Dr. Scott, which are set out above. The VE testified that an individual with the marked limitations assessed by Dr. Scott would not be able to sustain employment. Upon questioning by plaintiff's counsel, the VE testified that, considered individually, each of the marked limitations identified by Dr. Scott would likely preclude employment.

## ALJ's Decision

At the first step of his disability analysis, the ALJ found that plaintiff had not engaged in any substantial gainful activity after the alleged onset of her disability on January 1, 2005.

At the second step, the ALJ found that plaintiff's severe impairments included depression, panic disorder, and avoidant personality disorder with dependent personality features.

At the third step, the ALJ found that plaintiff did not have an impairment or combination of impairments that met or medically equaled any impairment in the "listings."

The ALJ next determined that plaintiff had the residual functional capacity (RFC) needed to perform the full range of work at all exertional levels. He found that her non-exertional limitations restricted her to simple routine tasks and instructions, precluded public contact, and allowed her to work in the vicinity of co-workers, but required that she avoid frequent one-on-one contact with co-workers.

In evaluating the effects of plaintiff's impairments, the ALJ found that, though her medically determinable impairments could produce some of the symptoms she alleged, plaintiff's statements concerning the intensity, persistence, and limiting effects of the symptoms were not entirely credible.

At the fourth step on his evaluation, the ALJ found that plaintiff could perform her past relevant work as a distribution clerk. Based upon that finding, he concluded that plaintiff was not disabled within the meaning of the Act.

## Standard of Review

A claimant is disabled if he or she is unable "to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The initial burden of proof rests upon the claimant to establish his or her disability. Roberts v. Shalala, 66 F.3d 179, 182 (9th Cir. 1995), cert. denied, 517 U.S. 1122 (1996). The Commissioner bears the burden of developing the record. DeLorme v. Sullivan, 924 F.2d 841, 849 (9th Cir. 1991).

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); see also Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Andrews, 53 F.3d at 1039. The court must weigh all of the evidence, whether it supports or detracts from the Commissioner's decision. Martinez v. Heckler, 807 F.2d 771, 772 (9th Cir. 1986). The Commissioner's decision must be upheld, however, even if "the evidence is susceptible to more than one rational interpretation." Andrews, 53 F.3d at 1039-40.

## Discussion

Plaintiff contends that the ALJ erred by failing to include all of her restrictions in his RFC assessment, and in concluding at step four of his analysis that she could perform her past relevant work as a distribution clerk. She also contends that he erred in concluding that

she was not wholly credible, erred in rejecting third-party witness testimony provided by her

former husband, and erred in rejecting the expert medical opinions of her physicians.


1. ALJ's Rejection of Medical Opinions

Because treating physicians have a greater opportunity to know and observe their

patients, their opinions are given greater weight than the opinions of other physicians.

Rodriguez v. Bowen, 876 F.2d 759, 761-62 (9th Cir. 1989).  Accordingly, an ALJ must

support the rejection of a treating physician's opinion with "findings setting forth specific and

legitimate reasons for doing so that are based on substantial evidence in the record."

Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989).  An ALJ must provide clear and

convincing reasons for rejecting a treating physician's uncontroverted opinions.  Lester v.

Chater, 81 F.2d 821, 830-31 (9th Cir. 1995).

The opinion of an examining physician is entitled to greater weight than the opinion

of a non-examining physician.  Pitzer v. Sullivan, 908 F.2d 502, 506 (9th Cir. 1990).  An ALJ

must provide clear and convincing reasons for rejecting the uncontradicted opinions of an

examining physician, id., and must provide specific and legitimate reasons that are supported

by substantial evidence in the record for rejecting an examining physician's opinion that is

contradicted by another physician.  Andres v. Shalala, 53 F.3d 1035, 1043 (9th Cir. 1995).


a. Dr. Kirkendall

As noted above, Dr. Kirkendall, an examining psychologist, opined that plaintiff

would have difficulty understanding and remembering instructions in a social setting, had

minimal adaptive skills, was increasingly isolated because of her mental health problems,

and, despite extensive treatment, appeared "to be getting worse, not better." He further opined that, at the time of the evaluation, plaintiff could not work.

The ALJ rejected Dr. Kirkendall's assessment as inconsistent with the GAF score of 55 which he assigned, which the ALJ opined indicated that plaintiff was able to work, and as inconsistent with plaintiff's ability to leave her house once a week, see her counselor, and shop when necessary. He also concluded that Dr. Kirkendall had erred in basing his opinion on plaintiff's "self reports of panic symptoms," and that plaintiff's condition improved when she took her prescribed medications, and deteriorated when she did not.

These reasons are not sufficient reasons for rejecting Dr. Kirkendall's largely uncontroverted opinion as to the severity of plaintiff's limitations. As discussed more fully below, the ALJ did not provide an adequate basis for concluding that plaintiff's description of her symptoms and limitations was not wholly credible. In the absence of sufficient support for his conclusion that plaintiff was not wholly credible, the ALJ's observation that Dr. Kirkendall based his opinion on plaintiff's description of her symptoms and limitations is not persuasive. In addition, Dr. Kirkendall assigned the GAF score of 55 when plaintiff was not working, and this score is consistent with the GAF scores that NP Mieth-Myers also assigned during times when plaintiff was not working. When she assigned those scores, Mieth-Myers specifically noted that plaintiff functioned at that level only when she had a predictable routine and was not subjected to work related stress. That observation is consistent with Dr. Kirkendall's opinion that plaintiff's ability to concentrate and remember instructions would diminish when plaintiff's anxiety level increased. Plaintiff's ability to leave her home occasionally does not provide clear and convincing, or even substantial, evidence that Dr. Kirkendall had overstated plaintiff's impairments. A careful reading of the

record does not support the ALJ's conclusion that plaintiff's condition improved when she took her medications and worsened when she did not, but instead shows that the medications often improved plaintiff's condition initially, but appeared to lose their effectiveness over time.

b. Dr. Scott

As noted above, Dr. Scott, an examining psychologist, diagnosed panic disorder with agoraphobia; major depressive disorder, recurrent, severe; avoidant personality disorder, and dependent personality features. He assigned a GAF score of 38, opined that plaintiff's ability to carry out activities of daily living was "very impaired," opined that plaintiff had "very little ability to work cooperatively with others," and opined that plaintiff had a number of moderate and marked impairments that would affect her ability to carry out work activities. As is also noted above, the VE testified that the marked impairments assessed by Dr. Scott would preclude competitive employment.

The ALJ rejected Dr. Scott's assessment on the grounds that plaintiff's ability to "persist, concentrate, and finish" the hours of testing he administered was inconsistent with the level of impairment he found. The ALJ characterized Dr. Scott's GAF score of 38 as "meaningless" in light of scores in the 50-60 range assigned by Mieth-Myers, and rejected the assessment of impairment noted in the forms Dr. Scott completed on the grounds that the forms and definitions were "not the ones Social Security uses." He further asserted that the limitations Dr. Scott assessed "do not necessarily preclude work" and that this determination "is in the realm of expertise of a vocational expert."

These are not sufficient reasons for rejecting Dr. Scott's assessment. Though the GAF score he assigned was significantly lower than scores assigned by other medical experts, it was consistent with other medical experts' opinions that plaintiff could not sustain gainful work activity. Plaintiff's ability to complete a battery of cognitive testing was not inconsistent with the conclusion that plaintiff could not sustain work activity 8 hours a day during a 5-day work week. Nor does any difference between the form completed by Dr. Scott and those used by the Agency undermine Dr. Scott's conclusion as to the severity of plaintiff's impairments and their likely effect on her ability to work. Though the definitions set out in the form Dr. Scott completed do not precisely match those in the form used by the Agency, they are quite similar. As the ALJ himself noted, the effect of the limitations Dr. Scott assessed was "in the realm of expertise of a vocational expert." The VE was fully aware of the definitions set out in Dr. Scott's form, and unequivocally testified that the marked impairments assessed by Dr. Scott would preclude employment. The ALJ did not provide clear and convincing, or even legitimate reasons for concluding either that Dr. Scott inaccurately assessed plaintiff's limitations, or that the limitations he assessed would not preclude employment.

c. NP Mieth-Myers

The ALJ rejected the opinion of Mieth-Myers, plaintiff's treating mental health practitioner, that plaintiff probably would not be able to complete a 40-hour work week, that plaintiff probably could not remain in a workplace for a full day because of her anxiety, and that plaintiff would likely decompensate if she attempted to return to work. In support of that rejection, the ALJ cited Mieth-Myers opinion that plaintiff might be able to work in a low

stress job without close proximity to co-workers or the general public, and her diagnosis of a

bipolar II disorder, for which he asserted there was "no clinical evidence . . . ."

These are not sufficient reasons for rejecting Mieth-Myers' opinion as to plaintiff's

limitations. Though Mieth-Myers stated that plaintiff could likely work in a simple routine

low stress job under certain conditions, she added that it was unlikely that she could do so

"without having accommodation for her illnesses." As plaintiff correctly notes, the

possibility that a claimant could perform a job if accommodations were provided is not

considered in evaluating whether an individual can perform a given job. See Cleveland v.

Policy Management Systems Corp., 526 U.S. 795, 803 (1999). As to the bipolar II disorder

diagnosis, Mieth-Myers' observation that plaintiff responded to medications indicated for

treatment of that disorder, and her observation that individuals with that disorder "tend to

exhibit more of the paranoia, irritability, and anxiety," provides some "clinical evidence" for

this diagnosis. In any event, the ALJ himself concluded that, whether the correct diagnosis

was depression or bipolar II disorder was "a moot point since both are affective disorders."


d. Effect of ALJ's failure to provide the required support for rejection of opinions of these
experts

Where, as here, an ALJ provides inadequate reasons for rejecting the opinion of a

treating or examining physician, that opinion is credited as a matter of law. Lester v. Chater,

81 F.3d 821, 834 (9th Cir. 1995). A reviewing court then has discretion to remand the action

for further proceedings or for a finding of disability and an award of benefits. See, e.g, Stone

v. Heckler, 761 F.2d 530, 533 (9th Cir. 1985). Whether an action is remanded for an award of

benefits or for further proceedings depends on the likely utility of additional proceedings.

Harman v. Apfel, 211 F.3d 1172, 1179 (9th Cir. 2000).  A reviewing court should credit the evidence and remand for a finding of disability and an award of benefits if: 1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; 2) there are no outstanding issues to be resolved before a determination of disability can be made; and 3) it is clear from the record that the ALJ would be required to find the claimant disabled if the evidence in question were credited.  Smolen v. Chater, 80 F.3d 1273, 1292 (9th Cir. 1996).

Here, the ALJ did not provide legally adequate reasons for rejecting the medical opinions in question.  There are no outstanding issues to be resolved before a determination of disability can be made, and it is clear that a finding of disability would be required if the opinions had been credited.  Under these circumstances, remand for an award of benefits is appropriate.

My conclusion that this action should be remanded for an award of benefits for the reasons discussed above makes it unnecessary to address the remainder of plaintiff's arguments.  However, in order to create a full record for any potential review, I will briefly address these additional issues.


2. ALJ's credibility determination

An ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities.  Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995).  If a claimant produces medical evidence of an underlying impairment, the ALJ may not discredit the claimant's testimony concerning the severity of symptoms merely because they are unsupported by objective medical evidence.  Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998) (citing Bunnell v. Sullivan, 947 F.3d 341, 343 (9th Cir. 1990)(en banc)).

Unless there is affirmative evidence that the claimant is malingering, the ALJ must provide "clear and convincing" reasons for rejecting the claimant's testimony. Id. (quoting Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995)).

An ALJ rejecting a claimant's testimony may not simply provide "general findings," but instead must identify the testimony that is not credible and the evidence that undermines the claimant's complaints. Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993). In addition, SSR 96-7 requires an ALJ to consider the entire record and to evaluate several factors, including the claimant's daily activities, medications taken and their effectiveness, treatment other than medication, measures other than treatment used to relieve pain or other symptoms, and "any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms."

Plaintiff here produced medical evidence of underlying impairments that could cause some degree of the symptoms alleged, and there is no evidence that plaintiff was malingering. Accordingly, the ALJ was required to provide clear and convincing reasons for concluding that plaintiff's statements concerning the severity and limiting effects of her symptoms were not wholly credible.

The ALJ found that plaintiff was not wholly credible based upon evidence that her condition improved when she took her medication, her ability to complete psychological testing, her failure to return to work, and her failure to avail herself of vocational rehabilitation services. These are not clear and convincing reasons for concluding that plaintiff was not credible. The record supports the conclusion that plaintiff's response to multiple combinations of medications has generally been poor, even when taken as directed, and that even medicines that have been effective initially have become less so over time.

The record does not support the conclusion that medications have reduced plaintiff's impairments to the point that she could complete a 40-hour work week. Plaintiff's failure to return to work, or to seek rehabilitation services, is consistent with the bulk of the evidence concerning the severity of her limitations. To the extent that the ALJ implied that plaintiff's failure to seek such services indicated her disinterest in improving to the point that she could work, plaintiff's efforts to continue therapy and treatment, even after losing her medical coverage, are notable.

3. ALJ's rejection of lay witness statements

The record before the court includes a questionnaire completed by Jack Holland, plaintiff's ex-husband. Mr. Holland stated that plaintiff suffered from insomnia, had difficulty with groups of people and social interaction, experienced physical pain related to stress and fatigued easily, was often frustrated and irritable, and had problems with remembering, concentrating, completing tasks, and getting along with others. In his sole reference to Mr. Holland's statements, the ALJ mentioned none of these observations. Instead, he noted only that Mr. Holland had indicated that plaintiff left the house at least once a week.

An ALJ "must give reasons that are germane" for rejecting the statements of a lay witness. Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993). The Commissioner contends that the ALJ did not reject Mr. Holland's statements, because his statements were consistent with the ALJ's assessment of plaintiff's RFC. This argument fails, because the ALJ's RFC does not include the kinds of limitations reasonably expected to result from the problems Mr. Holland noted. Mr. Holland's statements support Ms. Mieth-Myers' opinion that plaintiff

could not tolerate supervision or meet production demands, and support plaintiff's own testimony concerning the severity of her limitations. The ALJ erred in failing to discuss Mr. Holland's statements, and in failing to provide reasons that are "germane" for rejecting them.

4. ALJ's RFC and Hypothetical

In order to be accurate, an ALJ's hypothetical to a VE must set out all of the claimant's impairments and limitations. E.g., Gallant v. Heckler, 753 F.2d 1450, 1456 (9th Cir. 1984) (citing Baugus v. Secretary of Health and Human Services, 717 F.2d 443, 447 (8th Cir. 1983)). The ALJ's depiction of the claimant's limitations must be "accurate, detailed, and supported by the medical record." Tackett v. Apfel, 180 F.3d 1094, 1101 (9th Cir. 1999). If the assumptions in the hypothetical are not supported by the record, a VE's opinion that a claimant can work does not have evidentiary value. Gallant, 753 F.3d at 1456.

The ALJ's hypothetical to the VE did not meet these requirements. The hypothetical included neither plaintiff's allegations concerning her limitations, which the ALJ discounted without the required support, nor the limitations included in the questionnaire completed by Mr. Holland, which the ALJ rejected without discussion. The hypothetical also failed to include limitations described by Dr. Kirkendall, NP Mieth-Myers, and Dr. Scott, which the ALJ rejected without proper support. As noted above, the VE testified that the marked limitations assessed by Dr. Scott in a number of areas would preclude work.

Because the ALJ failed to include all of plaintiff's limitations in the hypothetical, the VE's testimony that plaintiff could perform her past work as a distribution clerk had no evidentiary value. In the absence of evidence that plaintiff could perform her past work, the

ALJ's ultimate conclusion that plaintiff was not disabled is not supported by substantial

evidence, and must be reversed.

#### Conclusion

The Commissioner's decision denying plaintiff's application for benefits is

REVERSED, and this action is REMANDED for an award of benefits.

DATED this 22nd day of March , 2010.

John Jelderks
U.S. Magistrate Judge